The STATE of Ohio, Appellee,

v.

FOSTER, Appellant.

[Cite as *State v. Foster*, 185 Ohio App.3d 117, 2009-Ohio-6213.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 91977, 92223.

Decided Nov. 25, 2009.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Michael E. Jackson, Assistant Prosecuting Attorney, for appellee.

Jerome Emoff, for appellant.

MARY EILEEN KILBANE, Presiding Judge.

{¶ 1} Appellant, Clarissa Foster, appeals her conviction on 64 counts, including numerous counts of theft, securing writings by deception, and receiving stolen property. Foster argues that insufficient evidence was presented to support her convictions, that the indictment was defective, and that the trial court erred in awarding restitution. After a review of the record and pertinent law, we affirm in part, reverse in part, and remand for an evidentiary hearing on the amount of restitution.

{¶ 2} On October 31, 2007, the Cuyahoga County Grand Jury issued a massive indictment resulting from an alleged mortgage-fraud scheme. Foster, in conjunction with Corritha J. Wells, Neal Wolf, Ace Home Loans, Inc. ("Ace"), Shaker Title Services Corporation ("Shaker Title"), Bettie Simpson, and Veil Holdings, Inc., were the subjects of the 270–count indictment.

{¶ 3} The following counts specifically applied to Foster. Foster was charged with one count of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1); 37 counts of theft, in violation of R.C. 2913.02(A)(3); 37 counts of securing writings by deception, in violation of R.C. 2913.43(A); 37 counts of receiving stolen property, in violation of R.C. 2913.51(A); 35 counts of telecommunications fraud, in violation of R.C. 2913.05(A); two counts of forgery, in violation of R.C. 2913.31(A)(2); one count of falsification, in violation of R.C. 2921.13(A)(8); and one count of conspiracy to commit the offense of engaging in a pattern of corrupt activity, in violation of R.C. 2923.01 and 2923.32(A)(1).

{¶ 4} On June 2, 2008, the trial court determined that the large number of counts was too overwhelming for one jury to manage; consequently, the trial court ordered that the counts be bifurcated and addressed in two separate trials. The state dismissed numerous counts before the first trial began.[1] The same day, the first trial commenced on 27 counts pertaining to Foster. Specifically, the state went forward on nine counts of theft by deception, nine counts of securing writings by deception, and nine counts of receiving stolen property, pertaining to nine different residential properties. All remaining counts were bifurcated.

{¶ 5} On June 10, 2008, at the conclusion of the trial, the jury found Foster not guilty of seven counts of theft; guilty of two counts of theft, with the value of the property at issue determined to be greater than $5,000 but less than $25,000; guilty of nine counts of securing writings by deception, with the property at issue in eight of the counts determined to be greater than $25,000 but less than $100,000, and on the ninth count the value of the property was determined to be greater than $100,000 but less than $500,000; and guilty of nine counts of receiving stolen property, with the value of the property at issue determined to be greater than $500 but less than $5,000.

{¶ 6} On August 11, 2008, the trial court sentenced Foster to one year of imprisonment on each of eight of the nine securing-writings-by-deception counts, to run concurrently with each other. On the remaining count of securing writings by deception, Foster was sentenced to two years of imprisonment. On

---

1. On January 23, 2008, the trial court granted the state's unopposed motion to dismiss counts 19–25, 116–150, and 179–185. The lenders that were the subject of these counts were no longer in business; therefore, they did not have representatives to testify on behalf of the state.

each of the receiving-stolen-property counts, Foster was sentenced to one year of imprisonment, to run concurrently with each other but consecutively to all other imposed sentences. Foster was sentenced to one year of imprisonment on each of the two counts of theft by deception, to be served concurrently with each other and consecutively to the other imposed terms, for an aggregate sentence of five years of imprisonment.

{¶ 7} Foster timely appealed her convictions to this court.

{¶ 8} On August 25, 2008, the second jury trial went forward, charging Foster with 22 counts of securing writings by deception and 22 counts of receiving stolen property pertaining to 22 separate residential properties. On September 3, 2008, the jury found Foster guilty of all 44 counts. On September 5, 2008, Foster was sentenced on two of the securing-writings-by-deception counts to one year of imprisonment on each count, to run consecutively to each other. On the remaining 42 counts, Foster was sentenced to one year of imprisonment on each count, to run concurrently with each other and concurrently with the two-year sentence on the previous counts. Further, the five-year sentence from the first trial was to run consecutively to the two-year sentence imposed in the second trial, for an aggregate sentence of seven years of imprisonment.

{¶ 9} Foster timely appealed her convictions to this court.

{¶ 10} This court consolidated both appeals for our review. Foster and the state each filed one brief addressing the lower court cases in tandem. Foster asserts three assignments of error for our review.

## ASSIGNMENT OF ERROR NUMBER ONE

The evidence at trial was insufficient to sustain any conviction and/or appellant's convictions are against the manifest weight of the evidence.

{¶ 11} Foster argues that her convictions resulting from both jury trials were not supported by sufficient evidence or, in the alternative, were against the manifest weight of the evidence.

### Background Facts

{¶ 12} The facts outlining the general scheme were essentially the same in both trials.

{¶ 13} Foster purchased Shaker Title in 2003. Foster worked in conjunction with Ace in order to induce Argent, a subprime mortgage lender, to provide home loans to individuals who did not actually qualify. Most of these properties ultimately went into foreclosure.

{¶ 14} Wolf was the owner of Ace and testified that Ace was a loan brokerage service that assisted interested home buyers in filling out loan applications, which were then forwarded on to various lenders, including Argent. Ace had a contractual relationship with Argent in which Ace was to verify the accuracy of the loan applications it prepared. Argent would then determine whether it would loan money to an individual based on certain established criteria.

{¶ 15} Argent's guidelines for approval required the buyer to make a down payment of 20 percent of the purchase price. Five percent was required to come from the borrower's own personal funds, but the remaining 15 percent was permitted to come as a gift from a family member.

{¶ 16} Many of the potential buyers who used Ace did not have the money for a down payment. Kelli Black worked as a loan processor for Ace, although she admitted that she did so without the proper state license. Black testified that she was trained by Ace to list fictional bank accounts on buyers' applications to falsely represent to the potential lender that the buyer had sufficient funds to make the required 20 percent down payment. Black stated that she made the information up "out of thin air."

{¶ 17} Foster, acting through Shaker Title, served as the closing agent in numerous residential property transactions referred to her by Ace. The properties at issue were located in Cleveland and the surrounding suburbs. Foster employed Koretia Williams to work as an escrow officer at Shaker Title. In her capacity as an escrow officer, Williams was responsible for ensuring that the buyer signed all necessary documentation, sending the documents to the lender, and distributing the sale proceeds. Williams was trained exclusively by Foster. Williams testified that she was trained to prepare HUD statements to reflect that the buyer was providing the mandatory 20 percent down payment, when in reality the money was coming from third-party companies.

{¶ 18} Foster's mother, Simpson, was employed as an office manager at Shaker Title. Simpson's responsibilities included general office duties, and she was also in charge of securing funds for buyers to use to secure their down payments. Simpson was also the owner of a company named WBS Diversified Management. WBS provided down-payment money for borrowers in return for a $500 transaction fee. Williams would tell Simpson the amount needed for the down payment, and Simpson would purchase a certified check in the buyer's name. Shaker Title would then forward a copy of the certified check reflecting the buyer's name to Argent.

{¶ 19} After a sale closed and the funds were disbursed, the seller would deduct the down-payment money from their proceeds and return it to WBS with an additional $500 transaction fee. Essentially, WBS earned $500 for simply

fronting a sum of money for several days, creating a ruse to make it appear to Argent that the buyer was in fact making the required 20 percent down payment.

## Analysis

{¶ 20} Foster argues that her convictions were not supported by sufficient evidence and, in the alternative, that her convictions were against the manifest weight of the evidence.

{¶ 21} This court's function when reviewing the sufficiency of the evidence is to determine whether the evidence presented at trial, if believed, would convince the average mind that the defendant is guilty beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 269, 574 N.E.2d 492. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rationale trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus. The determination as to whether sufficient evidence was presented is a question of law. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.

{¶ 22} The concepts of sufficiency of the evidence and manifest weight of the evidence differ substantively. This court could determine that while sufficient evidence was presented to satisfy the elements of the charges, the convictions were against the manifest weight of the evidence. *Thompkins* at 387, 678 N.E.2d 541. When assessing the weight of the evidence, this court looks to "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them." Id.

{¶ 23} Foster contends that there was insufficient evidence presented in both cases to demonstrate that she deceived Argent because while Ace had a contractual duty to verify the accuracy of the information it provided to Argent, Shaker Title did not have such a contractual relationship. However, a contractual relationship is not necessary in order to find that Foster deceived Argent.

{¶ 24} In the first trial, Foster was charged with theft in violation of R.C. 2913.02(A)(3), which states that "no person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * by deception." In both the first and second trials, Foster was charged with numerous counts of securing writings by deception and receiving stolen property. Securing writings by deception is governed by R.C. 2913.43(A), which states that "[n]o person, by deception, shall cause another to execute any writing that disposes of or encumbers property." Receiving stolen property is governed by R.C. 2913.51(A), which states that "[n]o person shall

receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense."

{¶ 25} Each of the charged offenses required the state to prove that Foster used deception to execute the fraudulent transactions. Deception is defined in R.C. 2913.01(A) as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." While the charged offenses do require the state to prove additional elements, Foster argues only that the state failed to prove the required deception; therefore, we will address only this element.

### First Trial (June 2, 2008)

{¶ 26} At the first trial, the state presented substantial evidence that Foster had acted knowingly to deceive Argent in closing numerous loan transactions. Although there is no evidence that Foster took part in falsifying loan applications, Foster and her employees provided Argent with false information on the buyers' HUD statements. Foster was to provide Argent with copies of cashier's checks provided by the buyers to demonstrate that the buyers had supplied their own funds. Foster and her employees called on Simpson, Foster's mother, and Debora Cofer, Foster's friend, to purchase cashier's checks in buyers' names through WBS, owned by Simpson, and Diversified Financial, a company owned by Cofer. The HUD statements were prepared to indicate that the money provided by WBS and Diversified Financial was actually provided from the buyer's own funds.

{¶ 27} Cofer testified that Foster explained to her how third-party loan companies worked and assisted Cofer in starting her own third-party loan company. Foster assured Cofer that this was permissible. Foster represented to Cofer that the down payments were not required to come from the buyers. Cofer had also placed Foster as a signatory on her bank account so Foster could obtain down-payment funds if Cofer was out of town.

{¶ 28} Ace's owner, Wolf, testified that Shaker Title served as the closing agent for all of the properties involved in the first trial. Williams, an employee of Shaker Title, testified that Foster trained her on how to prepare the closing documents and authorized her to affix Foster's stamp to the completed documents. Williams specifically indicated that nowhere on the HUD statement did Shaker Title indicate that third-party companies were providing the down

payment. On the contrary, Foster trained Williams to document on the HUD statement that the down payment was met with cash from the buyer.

{¶ 29} Marshella King testified that she bought property through Ace and Shaker Title and that she signed an inaccurate loan application that was presented to her by Shaker Title. Black testified that she purchased two homes while she was employed with Ace. The loan applications she completed with Ace contained false bank-account information, listed that the homes would be used as primary residences rather than as investment properties, and stated that the down payments would be coming from her own funds, when, in fact, Black used a third-party company. Black was sent to close her loans at Shaker Title. Foster prepared and signed the settlement documents closing the deals, and the documents contained no reference to the use of a third-party company.

{¶ 30} Douglas Thornton and Eric Cannaday provided similar testimony. Thornton and Cannaday applied for loans through Ace to purchase numerous residential properties as investments. Neither provided a down payment for any of the loan transactions. Cashier's checks were purchased in their names without their knowledge. All of the loans were closed at Shaker Title, and the checks were made out to Shaker Title.

{¶ 31} Tammy Carnes, a representative of Argent, testified that not only did Ace receive stipulations and conditions regarding what Argent required to close a loan transaction, but Shaker Title also received stipulations that stated that the buyer must provide a 20 percent down payment, of which 5 percent had to come from their own funds and the remaining 15 percent could come as a gift from family members. Carnes testified that Shaker Title was specifically responsible for verifying the down payment at closing.

{¶ 32} After a review of this testimony, we determine that the state presented sufficient evidence to support each of the charged offenses. In *State v. Wells*, Cuyahoga App. No. 92130, 2009-Ohio-4712, 2009 WL 2894461 (Foster's codefendant), this court concluded that the evidence was sufficient to establish theft, receiving stolen property, and securing writings by deception. This court found that although Wells was not directly involved in each of the fraudulent mortgage transactions, there was evidence that Wells trained her employees to perpetrate the fraudulent activity, which was sufficient to support the convictions. Similarly, in the instant case, while there was no evidence to demonstrate that Foster was directly involved in each transaction, there was ample testimony to support the state's contention that Foster trained her employees to commit this fraudulent conduct. Based on our reasoning in *Wells*, we conclude that there was sufficient evidence to support Foster's convictions.

{¶ 33} Foster also contends that her convictions were against the manifest weight of the evidence. She specifically argues that Ace committed the fraudulent acts by falsifying loan applications. Foster contends that by the time she received the loans, Argent had already been deceived into approving the loans; therefore, Foster contends there was nothing she could do to prevent Argent from going forward with the transactions.

{¶ 34} However, Foster neglects to acknowledge Carnes's testimony. Carnes stated that Argent could have canceled the loan transactions at any time prior to closing if it had been discovered that the conditions of the loans were not met. Foster documented that the funds received from third-party companies were actually cash from the borrowers and submitted copies of cashier's checks to Argent that made it appear as if they had been purchased solely by the buyers.

{¶ 35} If the buyers used the third-party companies prior to dealing with Shaker Title, the state would have had a difficult case because there would have been no indication on the cashier's checks presented to Shaker Title that the money was produced by third-party companies and not the buyers. However, the buyers never handled the checks themselves, and Foster herself used her mother's third-party company and even explained and assisted Cofer with establishing her own third-party company. Therefore, the evidence demonstrates that Foster had an active role in the deception.

### Second Trial (August 25, 2008)

{¶ 36} In the second trial, the state presented largely the same testimony, however, involving 22 different residential properties.

{¶ 37} Carnes testified that she reviewed the documents pertaining to the 22 loan transactions at issue. She stated that Shaker Title was the closing agent on each transaction. The closing documents indicated that the down payment had been provided as cash from the buyer, and the HUD statements prepared at Shaker Title indicated that the buyer provided the down payment, which was inaccurate. Third-party companies and not the buyers provided the down payments. Carnes testified that Argent sent a closing packet with a final HUD statement and instructions for use by Shaker Title. Shaker Title was on notice that the down-payment funds were to come from the buyer.

{¶ 38} Foster also testified on her own behalf. Foster stated that she had no specific recollections of the closings of the loan transactions at issue. Foster testified that the line on the HUD statements that indicates what funds were supplied by the buyer to her does not mean the buyer's private funds. It was her belief that those funds could come from a third-party company.

{¶ 39} Foster conceded that as an acting escrow officer at Shaker Title it was her responsibility to disburse funds at the direction of the lender and to interpret

the instructions from the lender. Foster admitted that she was under an obligation to accurately prepare the buyer's HUD statement. However, Foster maintains that the HUD statements at issue in the case must have been prepared by someone else and, therefore, she cannot verify their accuracy. Foster conceded that the loan transactions at issue did not contain any reference to the use of a third-party company on the buyer's HUD statement, which was the only portion that was sent to Argent.

{¶ 40} For the same reasons as indicated in our analysis of the first trial, we conclude that the convictions in this case were neither unsupported by sufficient evidence nor against the manifest weight of the evidence. The only significant difference in the second trial was that Foster testified on her own behalf. Although she claimed that she did not specifically remember the loan transactions at issue, and that they were prepared by a member of her staff, the overwhelming evidence indicates that she played an integral role in obtaining money from third-party companies and training her employees to inaccurately complete HUD statements.

{¶ 41} Therefore, Foster's first assignment of error is overruled.

## ASSIGNMENT OF ERROR NUMBER TWO

The indictment omits a mens rea element for the securing-writings-by-deception counts.

{¶ 42} Foster argues that the state failed to include the mens rea element of recklessness in the indictment with regard to the securing writings by deception counts, mandating reversal. We disagree.

{¶ 43} After all the evidence had been presented, Foster made an oral motion to the trial court, arguing that each of the securing-writings-by-deception counts should be dismissed pursuant to *State v. Colon,* 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, which held that an indictment is defective when it fails to state the requisite mens rea applicable to the offense. Each of the elements necessary for the state to obtain a conviction must be listed in the indictment in order to provide the accused with the opportunity to defend against the charges. Id. at ¶ 18. An indictment that fails to include any of the necessary elements is unconstitutional. Id. at ¶ 28.

{¶ 44} An indictment may describe the elements of an offense by quoting the applicable statute pursuant to Crim.R. 7(B), provided that the statute contains all of the necessary elements. Foster was charged with violating R.C. 2913.43(A), which provides that "[n]o person, by deception, shall cause another to execute any writing that disposes of or encumbers property, or by which a pecuniary obligation is incurred."

{¶ 45} This court recently addressed the identical issue in *Wells*, 2009-Ohio-4712, 2009 WL 2894461, which involved the same scheme. In *Wells*, this court determined the indictment to be sufficient when the exact language of R.C. 2913.43(A) was used because the defendant can refer to R.C. 2913.01(A), which defines deception as "knowingly deceiving another or causing another to be deceived by any false or misleading representation." Id. at ¶ 41. Therefore, Foster had adequate notice that the state was required to prove that Foster knowingly engaged in the proscribed conduct.

{¶ 46} Finding no merit to Foster's second assignment of error, it is overruled.

### ASSIGNMENT OF ERROR NUMBER THREE

The trial court abused its discretion in imposing restitution as a financial sanction.

{¶ 47} As part of Foster's sentence resulting from the first trial, Foster was ordered to pay $100,000 in restitution to Argent. Foster argues that the trial court failed to hold a hearing on restitution and further that the state failed to demonstrate that Argent suffered any financial harm as a result of Foster's conduct; therefore, the trial court erred in ordering restitution. We agree.

{¶ 48} A trial court may award restitution in an amount equal to the loss suffered by the victim, pursuant to R.C. 2929.18(A)(1). This court reviews a trial court's restitution order for abuse of discretion. *State v. Marbury* (1995), 104 Ohio App.3d 179, 181, 661 N.E.2d 271. In order for the trial court to have abused its discretion, there must be "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 49} "To establish the amount of restitution within a reasonable certainty, there must be some competent, credible evidence." *State v. Carrino* (May 11, 1995), Cuyahoga App. No. 67696, 1995 WL 277103. There must be sufficient evidence to support the order of restitution in the record. Absent sufficient evidence in the record, the trial court must hold an evidentiary hearing to determine the appropriate amount of restitution. Id., citing *State v. Wohlgemuth* (1990), 66 Ohio App.3d 195, 200, 583 N.E.2d 1076. The trial court is also required to hold an evidentiary hearing when the defendant disputes the amount of restitution. *State v. Preztak*, 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, at ¶ 36; R.C. 2929.18(A)(1).

{¶ 50} The state specifically requested that Foster be ordered to pay restitution to Argent in the amount of $745,450. Foster's counsel responded by disputing the amount, arguing that Argent did not lose $745,450 because Argent

was still the holder on the mortgages and may continue to receive payments from the buyers in the future.

{¶ 51} We conclude that because Foster specifically disputed the amount of restitution, the trial court was required to hold an evidentiary hearing on the issue. Therefore, this assignment of error is well taken.

{¶ 52} We remand this case to the trial court for an evidentiary hearing on restitution to determine the appropriate amount owed.

Judgment affirmed in part
and reversed in part,
and cause remanded.

STEWART and BOYLE, JJ., concur.